1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9    DAVID DANIEL CEPEDA,

10              Petitioner,              No. CIV S-04-1899 LKK JFM P

11         vs.

12   BRAD ESPINOZA, Warden,

13              Respondent.              FINDINGS AND RECOMMENDATIONS

14   _____/

15              Petitioner is a former state prisoner proceeding pro se with an application for a

16   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction on

17   charges of statutory rape of a minor, and contributing to the delinquency of a minor,[1] and lewd

18   and lascivious conduct with a child under the age of fourteen.[2]  Petitioner was sentenced to a

19   maximum determinate term of six years on the lewd acts conviction (Case No. 98F10893) and

20   two years in state prison for the unlawful sexual intercourse charge and 180 days in county jail

21   for the contributing to the delinquency of a minor charge in case No. 99F03098, to be served

22   concurrently with the six year mandatory sentence.  Petitioner also challenges a decision of the

23   _____

24         [1]  A jury convicted petitioner on both counts in Case No. 99F03098.

25         [2]  The first trial on these charges, brought in Case No. 98F10893, ended in mistrial on
     June 2, 1999.  (RT 1:173-76.)  After petitioner was convicted in 99F03098, petitioner pled no
26   contest in Case No. 98F10893, in return for a maximum six year prison term.

1    California Board of Parole Hearings (Board) rendered on July 22, 2004, revoking petitioner from

2    his release on parole on June 1, 2004.

3           Petitioner raises six claims in his second amended petition, filed June 8, 2005, that

4    his prison sentence violates the Constitution.  Respondent filed an answer on September 15,

5    2005.  Petitioner did not file a traverse.

6                                            FACTS[3]

7           Case No. 98F10893

8           As [petitioner] pleaded no contest, we take the facts from the
     probation report.

9
            At some time before October 22, 1998, [petitioner] invited eight-
10   year-old J.T. into his bedroom and put his fingers in her vagina;
     J.T.'s mother, Tyonne L., later found the victim's bloodstained
11   underwear.  J.T. also reported [petitioner] touched her vagina over
     her clothes in his van, touched her "butt" twice, and touched her
12   "boobs" twice.

13          Case No. 99F03098

14          In October 1998, [petitioner], a Sacramento resident in his 30's,
     visited the Rosebud Sioux reservation in South Dakota; Tyonne L.
15   and her young son and daughter came with him.  He met 17-year-
     old A.B. at her aunt's house on the reservation.  He bought beer for
16   her, her brother, and her cousin; they drank and smoked marijuana
     together.  (A.B. had begun drinking at age 11 and sometimes
17   blacked out.)  At some time during [petitioner's] stay, he and A.B.
     had consensual sex.

18
            When [petitioner] left, A.B. ran away with him in his van, along
19   with Tyonne L., Tyonne's sister Corra, Tyonne's son, and A.B.'s
     boyfriend Dale.  En route to California, [petitioner] said he did not
20   want to get caught transporting a minor (A.B.) across state lines.
     During the trip, A.B. did not display sexual interest in [petitioner].
21
            In Sacramento, A.B., Dale, and Corra stayed in Tyonne L.'s
22   apartment.  Because A.B., as a minor, had been unable to find
     work, [petitioner] hired her to help him lay carpets.  He paid her
23   with cash and marijuana.

24   ─────────────────

25          [3]  The facts are taken from the opinion of the California Court of Appeal for the Third
     Appellate District in <u>People v. Cepeda</u>, No. C034438 (March 18, 2003), a copy of which was
26   lodged with the court on September 21, 2005.

About a month after A.B. arrived in Sacramento, she and [petitioner] did a job installing carpets; she drank and smoked marijuana beforehand.  They finished late.  She asked him to take her home so she could see her boyfriend; he declined.  He bought alcohol while she stayed in his van, which had tinted windows.  They drank and smoked more marijuana at a parking lot.  [Petitioner] then drove to another parking lot.  A.B. asked him to take her home.  He demanded and received a kiss first.

As they sat in the front seat, [petitioner] touched her breast; she told him "no."  He pulled down her pants.  She was scared, crying, and still saying "No," but [petitioner] ordered her to get in the back.  Once there, she tried to push him off; he told her not to.  He pulled down her underwear and put his penis in her vagina.  Although she was wearing a tampon, he persisted for about ten minutes.  Afterward he called her a "bitch," accusing her of starting something and not finishing it.

[Petitioner] ordered A.B. into the passenger seat and gave her more marijuana.  He told her to stop crying and not to tell anyone what happened.

At A.B.'s request, [petitioner] took her to Sacramento Urban Indian Health Services.  Dale and Corra were already there.

After returning to Tyonne's apartment, A.B., feeling ashamed, took a lot of pills and did not immediately tell anyone she had done so.  In the meantime, Tyonne had called WEAVE about the assault.  Fire Department personnel came to the apartment, tried to wake A.B. up, then took her to the hospital.

At the hospital, feeling sick, A.B. spoke to a police officer for ten minutes.  He asked few questions and seemed reluctant to be there.  In her testimony, she denied telling him that she was at [petitioner's] apartment for much of the day, that [petitioner] had started to take her clothes off in the back of the van, that she was naked, or that she began intercourse with [petitioner] voluntarily but then decided to stop because she wanted to stay loyal to her boyfriend.

Leslie Schmidt, a nurse practitioner specializing in sexual assault cases, examined A.B.  A.B. said [petitioner] had forced her to have sex with him after grabbing her by her t-shirt to pull her into the back of the van, orally copulated her, masturbated her outside her vagina, and fondled and licked her breasts.  A.B. reported vaginal tenderness.  Schmidt's examination detected no visible injuries or evidence of semen.  However, her findings were not inconsistent with A.B.'s account.

Officer Steve Gralian, who interviewed A.B. at the hospital and wrote up a report, testified for the defense.  According to Gralian,

3

A.B. told him she and [petitioner] had not gone to his job on the day of the alleged assault; they were at his apartment drinking most of the day. She fell asleep in his van. Afterward, [petitioner] demanded a kiss before taking her home; she kissed him and got into the back of the van. He took off her clothes and they began to have intercourse. Then she told him she had had a change of heart and wanted to stay loyal to her boyfriend, but he refused to stop until after she pushed him off.[4]

[Petitioner] testified on his own behalf. He denied having intercourse with A.B. at any time.

According to [petitioner], he took Tyonne L. to the reservation because her grandfather was dying there. He met A.B. and her relatives, but did not provide them with alcohol or marijuana.

[Petitioner] did not plan to bring A.B. back to Sacramento with him. She hid under a painter's tarp in his van, and he did not discover her until they were in Nebraska. The others in the van told him she would turn 18 on November 5.

[Petitioner] lived near Tyonne L. in Sacramento. He sometimes saw A.B., Corra, and Dale in Tyonne's apartment; A.B. complained about having to stay there. He took her along on carpet-laying jobs and paid her in cash, not marijuana.

In early November 1998, [petitioner] planned to see his mother in Southern California. A.B. invited herself along.

[Petitioner] stopped in Reno to gamble. He parked in a lot, with A.B. sleeping in the back of the van. Then she woke up. Under the blanket, she was naked from the waist down. She asked him to join her back there. He had assumed she was 18 by now, but then he spotted her South Dakota driver's license, which had fallen out of her pants; it showed her 18th birthday had not yet arrived. He drove her back to Sacramento.

On cross-examination, [petitioner] denied ever providing marijuana or alcohol to a minor in California, then admitted that once in San Francisco he had driven an 11-year-old girl and two 13-year-old girls in his van and given them alcohol. Asked if he had ever engaged in sexual contact with a minor, he denied it, but

---

[4] On cross-examination, Officer Gralian admitted he had not asked A.B. whether she told [petitioner] to stop before or after he entered her vagina. He also admitted that when the prosecutor had asked him on the day of the preliminary hearing whether it would have been important to establish the point clearly, he said "well, maybe, if I have a real victim." He agreed with the prosecutor's statement that because of his report and his testimony at the preliminary hearing, this case was no longer one of forcible rape, as originally charged, but only of unlawful sexual intercourse.

1    only after trying to claim a Fifth Amendment privilege not to
     answer.  He admitted he had told a San Francisco police detective
2    that he could have touched his girlfriend's 11-year-old daughter
     accidentally because they all slept together, and might have
3    mistaken the child's body for his girlfriend's.  The tape of his
     interview with the detective was played in part for the jury, and a
4    transcript was also admitted into evidence.

5    (People v. Cepeda, slip op. at 3-7)

6                                    ANALYSIS

7    I.  Standards for a Writ of Habeas Corpus

8            Federal habeas corpus relief is not available for any claim decided on the merits in

9    state court proceedings unless the state court's adjudication of the claim:

10           (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as
11           determined by the Supreme Court of the United States; or

12           (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
13           State court proceeding.

14   28 U.S.C. § 2254(d).

15           Under section 2254(d)(1), a state court decision is "contrary to" clearly

16   established United States Supreme Court precedents if it applies a rule that contradicts the

17   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

18   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

19   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

20   (2000)).

21           Under the  "unreasonable application" clause of section 2254(d)(1), a federal

22   habeas court may grant the writ if the state court identifies the correct governing legal principle

23   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

24   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

25   simply because that court concludes in its independent judgment that the relevant state-court

26   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

                                           5

1 application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

2 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

3 question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

4 omitted).

5    The court looks to the last reasoned state court decision as the basis for the state

6 court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court

7 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

8 habeas court independently reviews the record to determine whether habeas corpus relief is

9 available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

10 II. Petitioner's Claims

11   1. Propensity Evidence

12    Petitioner's first claim is the trial court violated petitioner's constitutional rights

13 by instructing the jury with the 1999 revision of CALJIC No. 2.50.01[5] and 2.50.2[6] when the trial

14

---

15   [5] The trial court instructed the jury with CALJIC No. 2.50.01 (1999 rev.) as follows:
  "Evidence has been introduced for the purpose of showing that the defendant engaged in

16 a sexual offense on one or more occasions other than that charged in this case.
  "'Sexual offense' means a crime under the laws of a state or of the United States that

17 involves any of the following:
  "Contact, without consent, between any part of the defendant's body or an object and the

18 genitals or anus of another person.
  "If you find that the defendant committed a prior sexual offense, you may, but are not

19 required to, infer that the defendant had a disposition to commit the same or similar type sexual
offenses. If you find that the defendant had this disposition, you may, but are not required to,

20 infer that he was likely to commit and did commit the crime or crimes for which he is accused.
  "However, if you find by a preponderance of the evidence that the defendant committed a

21 prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he
committed the charged crime. The weight and significance of the evidence, if any, are for you to

22 decide." (Id.; RT 426-27.)

23   [6] The trial court instructed the jury with CALJIC No. 2.50.2 as follows:
  "'Preponderance of the evidence' means evidence that has more convincing force than

24 that opposed to it. If the evidence is so evenly balanced that you are unable to find that the
evidence on either side of an issue preponderates, your finding on that issue must be found [sic]

25 against the party who had the burden of proving it.
  "You should consider all of the evidence bearing upon every issue regardless of who

26 produced it." (Id.; RT 427.)

1   court had previously ruled that the tape was admitted for impeachment purposes only, and that

2   the impeachment evidence was unreliable because petitioner was intoxicated and thus it was

3   error for that evidence to be admitted.

4         a.  Jury Instruction Error

5         The last reasoned rejection of this claim is the decision of the California Court of

6   Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

7   claim, finding that, despite petitioner's view that the evidence was admitted under California

8   Evidence Code §§1108 and 1101(b),  the evidence of prior sexual offenses was admitted "only

9   for impeachment on cross-examination."  (<u>People v. Cepeda</u>, slip op. at 17.)

> CALJIC No. 2.50.01 is intended for use only where the prosecution offers evidence of prior sexual offenses to prove propensity under Evidence Code section 1108.  (See Use Note to CALJIC 2.50.01 (6th ed. 1996), p. 90.)  As the evidence here did not come in for that purpose, we doubt the instructions should have been given.  However, any error was harmless because it is not reasonably probable [petitioner] would have fared better had the instructions been omitted.
>
> Even though the evidence about S.P. was elicited only for impeachment, i.e., to show [petitioner's] lack of credibility, lay jurors likely have used it in addition as evidence of propensity. Thus, a lay juror would likely think, *if he molested a minor before, it is more likely he would do it again.*  The instructions given correctly told them how to assess that evidence.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 922 [dictum approving 1999 version of CALJIC No. 2.50.01].)  Because the 1999 revision of CALJIC No. 2.50.01, which the trial court gave, instructs the jury not to infer guilt on the charged offense even if it finds by a preponderance of the evidence that the prior offense occurred, the instruction on balance favors [petitioner].  (See *People v. Falsetta*, *supra*, 21 Cal.4th at p. 920.)
>
> . . . .
>
> [Petitioner] contends in reliance on federal circuit court decisions that CALJIC No. 2.50.01 (1999 rev.) violates the due process clause of the Fourteenth Amendment to the United States Constitution.  However, we are not obligated to follow decisions of the federal courts, other than the Supreme Court, even on federal questions.  (*People v. Cleveland* (2001) 25 Cal.4th 466, 480.)  We prefer to follow the dictum of the California Supreme Court on this issue.  (*People v. Falsetta, supra*, 21 Cal.4th 903, 920; *People v.*

7

1    *Miller* (1999) 69 Cal.App.4th 190, 200-201 [dictum of California
2    Supreme Court is highly persuasive].)

3    (People v. Cepeda, slip op. at 17-18.)

4           In general, a challenge to jury instructions does not state a federal constitutional

5    claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

6    U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

7    warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable,

8    erroneous, or even "universally condemned,"' but must violate some due process right

9    guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir.

10   1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail on such a claim

11   petitioner must demonstrate that the "ailing instruction . . . so infected the entire trial that the

12   resulting conviction violates due process.'"  Middleton v. McNeil, 541 U.S. 433, 437 (2004)

13   (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  In making its determination, this court

14   must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as

15   a component of the entire trial process.'"  Prantil, 843 F. 2d at 317 (quoting Bashor v. Risley, 730

16   F.2d 1228, 1239 (9th Cir. 1984)).  See also Middleton, 541 U.S. at 437.  Where, as here, the

17   challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially

18   heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than

19   a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte

20   v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

21          The United States Court of Appeals for the Ninth Circuit in Gibson v. Ortiz, 387

22   F.3d 812, 919 (9th Cir. 2004) found a due process "lessening of the burden of proof" problem

23   with the combination of jury instructions CALJIC 2.50.01 and 2.50.1.  Gibson, 387 F.3d at 919.

24   The Gibson court held that relating to the jury that they could infer that plaintiff committed the

25   crime by proof of prior offenses, and immediately relating to the jury that the requisite proof

26   /////

1   could be established by only a preponderance of the evidence, instructed the jury that proof of the

2   charged offense could be found by a preponderance of the evidence. Id., 387 F.3d at 822.

3          However, in 1999, California added cautionary language to CALJIC 2.50.01, that

4   states "[h]owever, if you find by a preponderance of the evidence that the defendant committed a

5   prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he

6   committed the charged crime.  The weight and significance of the evidence, if any, are for you to

7   decide." People v. Reliford, 29 Cal.4th 1007, 1012, 130 Cal.Rptr.2d 254 (2003).

8          Here, unlike in Gibson, the jury was instructed using the 1999 revision as well as

9   CALJIC No. 2.50.2, which made clear to the jury that the propensity evidence, standing alone,

10  could not serve to prove petitioner committed the instant crimes beyond a reasonable doubt.[7]

11  Accordingly, although it was error to give these instructions based on evidence admitted solely

12  for impeachment, the error was harmless, even helpful, to petitioner.  The instructions accurately

13  stated the propensity evidence could not be used to prove petitioner committed the instant

14  crimes.  Thus, the state court's rejection of petitioner's first claim for relief was neither contrary

15  to, nor an unreasonable application of, controlling principles of United States Supreme Court

16  precedent.  Accordingly, this claim must be denied.

17              b.  Unreliable Impeachment Evidence from Uncharged Prior Offense

18          Petitioner challenges the admission of a tape recording of an interview of

19  petitioner by a San Francisco detective in which petitioner stated he might have accidentally

20  touched a minor's breasts thinking she was his adult girlfriend while they were all sleeping in the

21  same bed.  (CT 258-60.)  This statement was admitted at trial to impeach petitioner's testimony

22  denying he had inappropriate prior sexual behavior with a minor.  (RT 2:352-53.)  Petitioner

23  argues that this evidence was unreliable based on petitioner's intoxication at the time of the

24  /////

25

26          [7] The jury was also properly instructed on the meaning of reasonable doubt.  (RT 2:429.)

9

1  recording.  However, petitioner concedes he has failed to exhaust this claim and offers to "waive

2  ground . . . if the Attorney General opposes. . . ."  (Second Am. Pet. at 5.)

3        Respondent objected to petitioner's attempt to raise this unexhausted claim so late

4  in the proceedings.  Because this claim is unexhausted, it should be dismissed.

5        In light of the above, petitioner's first claim for relief should be denied.

6     2.  Ineffective Assistance of Counsel

7        Petitioner's second claim is that defense counsel rendered ineffective assistance in

8  Case No. 99F03098 because he failed to object to the giving of jury instruction CALJIC 2.50.01

9  and the introduction of the audio tape evidence of the 1993 police interview.  (Second Am. Pet.

10  At 5; P's & A's at 3.)

11        The Sixth Amendment guarantees the effective assistance of counsel.  The United

12  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

13  Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

14  counsel, a petitioner must first show that, considering all the circumstances, counsel's

15  performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

16  identifies the acts or omissions that are alleged not to have been the result of reasonable

17  professional judgment, the court must determine whether, in light of all the circumstances, the

18  identified acts or omissions were outside the wide range of professionally, competent assistance.

19  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

20  counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

21  range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

22  Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

23  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

24  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

25        Second, a petitioner must establish that he was prejudiced by counsel's deficient

26  performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

1   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

2   been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine

3   confidence in the outcome." Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

4   F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

5   performance was deficient before examining the prejudice suffered by the defendant as a result of

6   the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

7   lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949,

8   955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

9      a.  CALJIC 2.50.01.

10     The last reasoned rejection of this claim is the decision of the California Court of

11  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

12  claim as follows:

13     Defense counsel could plausibly have refrained from objecting to
    the instructions, even if he recognized that they were technically
14  erroneous here, for precisely that reason.  If counsel reasoned that
    the jury might consider the prior-acts evidence to show propensity,
15  he could have decided the jury ought to know the proper legal
    standard for evaluating propensity evidence.  Therefore, counsel
16  did not act ineffectively by failing to object to the instructions.

17  (People v. Cepeda, slip op. at 18.)

18     As noted above, the fact that the trial court instructed the jury with instructions

19  CALJIC 2.50.01 and 2.50.2 properly informed the jury that they could not use the prior sexual

20  offense evidence to find petitioner guilty of the offenses at issue here, this court cannot find that

21  defense counsel was ineffective for failing to raise an objection to the instructions.  As noted by

22  respondent, these jury instructions might well have assisted petitioner in that it informed the jury

23  as to the proper use of this evidence, specifically advising the jury that they could not find

24  petitioner guilty of the underlying charges solely on the basis of this uncharged evidence.  This

25  claim should be denied.

26  /////

1            b.  Audio tape

2            Petitioner contends defense counsel was ineffective based on counsel's failure to

3   object to the introduction and use of the audio tape evidence.  Petitioner argues this evidence

4   unfairly impeached petitioner as it allowed the jury to infer petitioner had a disposition to commit

5   the same or similar type of sexual offenses.  Petitioner points out that defense counsel sought no

6   relief when the trial court noted it was perplexed by the prosecution's offer of proof and had

7   expected something more substantive than the audio tape provided and stated, on the record, that

8   the court would not have granted the prosecution's request on the basis of the audio tape alone.

9   Petitioner argues that but for the admission of the audio tape and the facts underlying the 1993

10  allegations, it is reasonably probable that the results of the proceedings would have been

11  different.

12           Respondent, on the other hand, argues that the audio tape was being used to

13  refresh petitioner's recollection and that petitioner invited the prosecution to admit the tape.

14  Respondent also contends that California Evidence Code § 785 provides that "[t]he credibility of

15  a witness may be attacked or supported by any party, including the party calling him."  (Id.)

16  Respondent argues that defense counsel could not have objected to the statements made on the

17  audio tape because they were introduced as impeachment evidence to counter petitioner's

18  unequivocal denial of prior sexual misconduct with a minor.  Respondent contends the state court

19  properly found that the scope of impeachment includes evidence of prior uncharged acts which

20  would be admissible for other purposes.

21           The last reasoned rejection of this claim is the decision of the California Court of

22  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

23  claim as follows:

24           **Background**

25           The prosecutor moved in limine for an order admitting evidence
           that [petitioner] had been charged with molesting four female
26           minors in San Francisco in 1993.  The motion asserted the

12

evidence was relevant under Evidence Code section 1108 to show [petitioner's] propensity to molest female minors, and under Evidence Code section 1101, subdivision (b), to show intent, opportunity, and common plan, to corroborate the victim, and to rebut the anticipated defense. [Petitioner] opposed the motion.

At the hearing on the motion, the prosecutor said she would call S.P., one of the minors in the prior incident, as a witness, and sought to introduce evidence only as to her. The trial court granted the motion. However, the prosecutor put on her case and rested without calling S.P.[8]

On cross-examination, [petitioner] denied ever having given alcohol or marijuana to a minor. The prosecutor then elicited [petitioner's] admissions that he knew the minors involved in the 1993 incident, and also knew S.P. was around 11 years old then. [Petitioner] further admitted he had been accused of giving the minors alcohol and had been interviewed about it by the police, but denied guilt and claimed he was drunk and blacked out during the interview.

The prosecutor asked whether [petitioner] had ever engaged in sexual conduct with a minor. [Petitioner] said "I can't answer that. I assert my Fifth Amendment rights." Directed to answer, he said he had not. He specifically denied such conduct as to J.T. (The victim in case No. 98F10893) and S.P.

The prosecutor then questioned [petitioner] about what he had told the police concerning S.P. He claimed difficulty in recalling and agreed it might "help refresh [his] recollection" to hear a tape of the interview.

The trial court directed counsel to pick out the relevant portion of the tape; they did so. After hearing it outside the jury's presence, the court ordered the prosecutor to prepare a transcript for the jurors. Ultimately, the jurors heard that part of the tape and got copies of the transcript to read as they listened.[9]

/////

---

[8] During the conference on jury instructions after the defense rested, the trial court said it had granted the prosecutor's in limine motion based on the offer of proof that S.P. would testify; if the court had known that only the tape of [petitioner's] police interview would be put in evidence, it would not have granted the motion. The prosecutor replied that she had genuinely intended to put on S.P. in her case-in-chief, but "when that didn't occur," she offered the tape only as impeachment after [petitioner] testified he had never done anything improper with minors. [RT 413-14.]

[9] The transcript shows that the portion of the tape played concerned only the allegations as to S.P.

The prosecutor then asked more questions about the interview. [Petitioner] agreed he might have meant to tell the detective that he mistook the body of 11-year-old S.P. for that of her mother when rolling over in bed as they slept.

**Analysis**

Although the prosecutor initially offered the evidence as to S.P. under Evidence Code sections 1108 and 1101, subdivision(b), she did not use it that way.  She used it only for impeachment on cross-examination after [petitioner] denied sexual conduct with any minor. [Petitioner] fails to show it could not properly be used for this purpose.

The scope of evidence admissible to impeach a testifying defendant is wide enough to include evidence of prior uncharged acts which would be inadmissible for other purposes.  (Evid. Code, §§ 780, 1101, subd. (c); *People v. Humiston* (1993) 20 Cal.App.4th 460, 479.)  Though [petitioner] offers argument in his opening brief that the evidence was inadmissible under Evidence Code sections 1108 and 1101, subdivision (b), he offers none that it was inadmissible for impeachment.[10]  Therefore, he has failed to show that the trial court abused its discretion by allowing the evidence to come in for that purpose, or that trial counsel was ineffective for failing to object to that use of the evidence.

As [petitioner] has not shown an abuse of discretion in admitting the evidence for impeachment, we need not decide whether it could properly have come in under the Evidence Code provisions the prosecutor originally cited.

(People v. Cepeda, slip op. at 12-15.)

The record reflects the following.

On July 6, 1999, the prosecution filed a motion in limine to allow evidence of prior conduct pursuant to California Evidence Code §§ 1108 and 1101(b).  (CT 175.)  The prosecution sought to admit evidence of prior sexual offenses allegedly committed by petitioner in 1993, by calling one witness, Susanna Pedrosa-Corona, in the prosecution's case-in-chief.

---

[10] [Petitioner] attempts to do so for the first time in his reply brief.  The point is waived due to [petitioner's] unexplained failure to raise it in the opening brief.  (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn.8.)  In any event, [petitioner] does not make a persuasive argument: he merely asserts his point, then cites a string of cases in which other kinds of impeachment evidence were found improper.

14

1   (CT 176.)  While the prosecution did not seek to introduce evidence of petitioner's prior

2   unlawful sexual acts of child molest of an eight year old girl which were pending (Case No.

3   98F10893), the prosecution argued that Case No. 98F10893 was relevant to demonstrate that the

4   1993 charges were not too remote in time to be admitted here.  (CT 175-76.)

5          The motion in limine was heard by the trial court on July 6, 1999.  (CT 188; RT

6   2:78.)  Defense counsel argued against admission of the evidence, arguing the 1993 case was

7   remote in time, dissimilar to the instant charges, and that the prejudice to petitioner outweighed

8   the probative value of the 1993 evidence.  (RT 2:80-84.)  The motion to admit evidence of the

9   1993 prior sexual conduct was taken under submission.  (CT 188; RT 2:78-84.)

10         The minutes from the second day of trial, July 7, 1999, state that "People's in

11   limine taken under submission previously was GRANTED."  (CT 189.)  The court's actual ruling

12   on the in limine motion was either not rendered in open court or was not transcribed by the court

13   reporter.[11]  (See RT 2:178-79.)  However, the prosecution closed its case and did not call Susanna

14   Pedroza as a witness.

15         On July 8, 1999, the prosecution cross-examined petitioner.  (RT 2:344.)

16   Petitioner denied ever providing marijuana or alcohol to a minor in California.  (RT 2:349.)

17   Petitioner admitted knowing Susanna Pedroza, Maria Escabar, a "Tonya," and Ema Castanayo in

18   1993.  (RT 2:349.)

19         Q:     . . .do you recall in 1993 taking these young women in a van driving them
                  in San Francisco area giving them alcohol and Marijuana?

20

21         A:     It had been so long ago when you first asked the question that I didn't
                  remember it, you know.  But yes, yes, I remember now.

22

           . . .

23

24         [11]  The transcript for the morning session of July 7, 1999, consists of  a little over one
     page, none of which addresses the motion in limine taken under submission on July 6, 1999.  (RT

25   2:178-79.)  In respondent's brief filed August 25, 2005 in the Third District Court of Appeal,
     respondent noted the court reporter Jean Smart told respondent that the court's ruling was not

26   reported.  (Id., at 18 n.8.)

1        Q:     And you remember providing each of them alcohol?

2        A:     I bought alcohol and they took it and drank when I left the car.

3            Q:     Do you recall giving them Marijuana?

4        A:     No.

5  (RT 2:350-51.)  The prosecution asked petitioner if he recalled speaking with particular law

6  enforcement officers in connection with those events in 1993.  (RT 2:351.)  Petitioner testified he

7  vaguely remembered, but he was "pretty inebriated."  (RT 2:351.)  Petitioner admitted he was in

8  a car with minors and drunk in San Francisco in 1993.  (RT 2:352.)  Petitioner admitted he was

9  so drunk he blacked out.  (RT 2:352.)

10        Q:     And with respect to having your statement that you never had sex with
11               Alice, are you saying that you never . . . engaged in any sexual contact with a minor, that's what you're saying?

12        A:     I can't answer that.  I assert my Fifth Amendment rights.

13  (RT 2:352.)  The court informed petitioner he could not plead the Fifth but must answer the

14  question.  (RT 2:353.)

15        Q:     Have you ever . . . engaged in any inappropriate sexual behavior with a
16               minor?

17        A:     No, I haven't.

18        Q:     Who is Jowitta Tobacco?

19        A:     Who is she?

20        Q:     Yes.

21        A:     She's a neighbor.  Alice's cousin.  Alice.

22        Q:     Did you ever do anything sexually inappropriate with her?

23        A:     No.

24        Q:     How old is Jowitta Tobacco?

25        A:     I believe nine.

26        Q:     What about Susan Pedroza, ever do anything sexually inappropriate with an eleven year old?

1     A:    No.

2     Q:    Do you recall when you talked to Fillanders do you recall being asked the question, has there been any occasion when you could have accidentally touched Susanna?

3

4     A:    Very vaguely.

5     Q:    Do you recall your response?

6     A:    That it was possible because we all slept in the same bed together by accident.

7

8     Q:    Do you recall being asked then if you're all sleeping in the same bed would it be possible you could have touched her?

9     A:    Yes, I think I do remember that question.

10    Q:    And at one point were you asked that – did you tell them that you did touch Susanna, the eleven year old?

11

12    A:    Tell him?

       Q:    Her, Flanders?

13    A:    Can you ask that one more time, please.

14    Q:    Did you ever tell a police or law enforcement investigator in San Francisco that you touched an eleven year old?

15

16    A:    Did I ever tell them?  I said I might have by accident.

17    Q:    When you were asked, Well, maybe you were thinking of an adult when you touched her, what was your response to that?

18

19    A:    I don't know if that's the question.  Can I look at the report, please.

       Q:    Do you recall the question?

20    A:    I'm just saying I don't remember that exact question.

21

22    Q:    Referring to the transcript.

       A:    Can I look at --

23    Q:    page 15 line five starting with, could you possibly have touched her thinking she was Rosa?

24

25    A:    Can I see that, please?

26    Q:    Okay.

A:      Okay.  Who was this now?  Line 15?  What line again, give.  Now, I never saw a report like this, so I'm not sure where you got this or what, you know.

Q:      Was the interview with Fillanders taped, would it help refresh your recollection to listen to a tape-recording of that conversation?

A:      It sure would.  If it was in fact my voice.

(RT 2:353-55.)  At this point, the prosecution asked to play the tape-recording; defense counsel asked to approach the bench and then asked to have the tape played outside the presence of the jury.  (RT 2:355.)  An off the record sidebar was conducted, after which the court reported that counsel agreed to find the appropriate portion of the tape and that portion of the tape would be played to the jury.  (RT 2:356.)

Q:      When you were in San Francisco in 1993 with those juveniles in the car and there was alcohol, did you touch them in a sexually inappropriate manner?

A:      No, I did not.

(RT 2:356.)  The prosecution asked more questions about the victim in the instant case, then returned to the events of 1993:

Q:      The alcohol that you provided to Maria and Susanna and Ema in 1993, where did you get that at?

A:      You're saying I provided it to them, I bought it for myself.

Q:      The alcohol that you bought in 1993?

A:      Yeah, there you go.

Q:      And the same day you were in the car with three minors and you were drinking, where did you buy that alcohol?

A:      At the liquor store.

Q:      What liquor store?

A:      I don't remember.

Q:      Did you take the little girls into the liquor store with you or did you have them wait in the car when you went and bought it?

A:      I got it by myself.

18

1     Q:     And how much did you buy?

2     A:     How much did I buy?  Two quarts.

3     . . .

4     Q:     And they drank the entire two quarts?

5     A:     I drank some.

6     Q:     How much did you drink?

7     A:     I don't remember.

8     Q:     . . . Do you recall when you talked to the female police officer that you
             were still sick from the alcohol, do you recall that?
9
10    A:     I recall that.

      Q:     Do you recall throwing up in front of her?
11
12    A:     I recall –

      Q:     And do you recall her making the comment about smelling like the
13           brewery; do you recall that?

14    A:     No, I don't recall that.

15    Q:     And do you recall telling her that any of those girls in the car were drunk?

16    . . .

17    A:     I can't gauge that.  I can't say if somebody is drunk or not.

18    Q:     Can't say at all?

19    A:     I was myself drunk, yeah.

20    Q:     And you couldn't tell like if the eleven year old was effected in any way at
             all by the alcohol?
21
22    A:     I can't tell.

      Q:     You couldn't tell if the sixteen year old was effected in any way at all by
23           that alcohol?

24    A:     No.

25    Q:     But what you're telling me is that all of this case out of just two quarts;
             correct?
26

1      A:    No, I'm not saying that.

2      Q:    Well, how much alcohol did you have when you were with those girls?

3      A:    I had two quarts.

4      Q:    How much did you buy when you were with those – alcohol, when you were going to take them home?

5

6      A:    Two quarts, approximately.  I don't remember exactly I can't – . . .but I know I had at least . . . two quarts.

7      THE COURT:  Two quarts of what?  What are we talking about, beer?

8      A:    A very strong malt liquor.

9      THE WITNESS:  Some Cisco.  It's called Cisco.  It's wine, very, very powerful five, six, seven percent, I think at least.

10

11  (RT 2:361-63.)  The prosecution then returned to questioning petitioner about the instant victim.

12  Court adjourned so the prosecution could locate that portion of the tape to play for the jury.  (RT

13  2:366.)

14      THE COURT:  I've heard a portion of the tape that the district attorney is intending to play for impeachment purposes of this

15      witness, and while she finds it intelligible I find it somewhat unintelligible and I've directed she prepare a transcript so that the

16      relevant portions – so that you will provide a copy for each of the jurors so that you can follow along the transcript with the tape so

17      that if you find it also unintelligible at least you'll know what both attorneys agree is being said on the tape.

18

19      The district attorney and Mr. O'Reilly will be getting together and make sure they're in agreement on what portions of the tape that

20      are transcribed will be played so that there wouldn't be any confusion.  I didn't want anyone to misunderstand anything that

21      might be on the tape.

(RT 2:366.)

22

23      On July 12, 1999, the jury trial reconvened and defense counsel stated he had had

24  an opportunity to review the transcript and was satisfied of its accuracy.  (RT 2:368.)  Before the

25  tape could be played, petitioner asked for substitution of counsel pursuant to People v. Marsden,

26  2 Cal. 3d 118 (1970).  (RT 2:369.)

1          At the Marsden hearing, petitioner complained that defense counsel failed to

2   object to a few key issues, such as when the court said petitioner was "here on a charge of

3   unlawful sexual intercourse with a child," and "not mentioning anything about this audio tape."

4   (RT 2:371.)  Petitioner stated that defense counsel did not review the audio tape with petitioner;

5   in fact, petitioner had just learned of its existence.  (RT 2:372.)  Petitioner complained that

6   defense counsel said he was going to file a brief concerning the prosecution's in limine motion

7   regarding the 1993 evidence, but counsel did not.  (RT 2:375.)[12]  The court stated defense

8   counsel already argued against the motion in limine.  (Id.)

9          Petitioner complained that the DA told defense counsel that if petitioner took the

10   stand she would drag this out, but defense counsel didn't tell petitioner that.  (RT 2:375.)

11   Petitioner argued that defense counsel was not addressing petitioner's "state of mind and the tape

12   itself, I was obviously drunk if I was throwing up, and that issue doesn't come into play here."

13   (RT 2:378.)  Petitioner said defense counsel advised him repeatedly to take the stand and that if

14   he did not, he would be convicted.  (RT 2:378.)  The court asked petitioner if he didn't want to

15   take the stand and petitioner replied, "No.  I'm not saying that.  I'm saying if I was better

16   informed, I might not have taken the stand."  (RT 2:378.)  Petitioner stated defense counsel failed

17   to provide him with a copy of the prosecution's motion in limine concerning the 1993 evidence.

18   (RT 2:379.)

19          Petitioner said there is a video about the alleged incident in San Francisco and that

20   petitioner needed to discuss with defense counsel whether to seek admission of the video in an

21   effort to rebut the audio tape.  (RT 2:384.)  The court then gave defense counsel an opportunity to

22   respond.  (RT 2:386.)

23          Defense counsel stated the following.  Petitioner told counsel about the audio tape

24   ────────────────

25   [12]  On May 17, 1999, defense counsel previously filed a motion in limine to exclude
   evidence of prior sexual misconduct and to preclude any reference to the fact of other alleged
   criminal conduct not forming a basis for any charge herein during the course of the trial.  (CT 60;

26   76.)  However, that trial ended in mistrial on June 2, 1999.

a long time before defense counsel received the tape, so petitioner was aware of it.  (RT 2:386.)

Petitioner had a copy of the tape.  (RT 2:388.)  The prosecution said she would like to file a

formal motion in limine; the court then asked the prosecution if the motion could be filed that

day and she responded it could.  (RT 2:387.)  He  responded that he wasn't sure, "but anyway,

the court already ruled on that.  And the court took down the citation of the key cases anyway."

(RT 2:387.)  He repeatedly told petitioner to take the stand, but advised it was up to petitioner.

(RT 2:388.)  He did not have a copy of the motion in limine to provide petitioner that day, but

noted that petitioner "has immediate legal issues in front of him, then diverts my attention to side

issues of the other case, and then these copies end up in <u>Marsden</u> motion, or they end up in writs

at the Appellate Court.  I'd rather spend my energy on the case at hand rather than issues that

have already been decided."  (RT 2:388.)

> There is a video which
>
> is an incantation by Susana Pedroza and her mother.  And, again,
> that's rebuttal in case they did show up.  I had made an election
> there that I would not use it, because it's clear in the tape that the
> mother, sometimes in the Spanish language, is telling the daughter
> what to say.  And I felt the whole setup there would probably leave
> an unfavorable impression.

(RT 2:389.)  He was the third attorney in the lead case; there were two prior <u>Marsden</u> motions

prior to his appointment in the case, which totaled five <u>Marsden</u> motions between the two cases,

three of which were directed at present defense counsel.  (RT 2:390.)

> In rebuttal, petitioner argued defense counsel "could have at least told [petitioner]

to listen to [the audio tape], set me up with a hearing on it."  (RT 2:391.)  The trial court denied

the <u>Marsden</u> motion.  (RT 2:391.)

> The jury trial reconvened and, after more questions concerning the instant victim,

the prosecution returned to the events of 1993.  (RT 2:399.)

> Q  You're aware Susana had made allegations you were touching
> her vaginal area, correct?

> A  That's correct. . . .
>
> Q  And you were asked questions about that in San Francisco in 1993, correct?
>
> A  That's correct. . . .

(RT 2:399.)  At that time, the audio tape was played for the jury.  (RT 2:400.)[13]  The trial judge did not admonish the jury that the evidence from the audio tape could only be used for impeachment purposes.  (See RT 2:400; 419-31; CT 199-209.)  The prosecution resumed questioning.  Petitioner confirmed it was his voice on the tape.  (RT 2:401.)

> Q  With respect to the allegations of touching Susana Pedroza, what you told the officer, is it fair to say that what you were trying to tell the officer is you may have mistaken the body of an 11-year-old girl for that of your girlfriend?
>
> A  When you're sleeping at night, everything is possible.  When you roll over and stuff, that's what I was trying to insinuate.
>
> . . .
>
> Q  Would that . . . also apply to the specific allegation of fondling her vaginal area of – well, that you mistook the vaginal area of an 11-year-old girl of that of your girlfriend?
>
> A  That's an accusation.
>
> Q  So is that "yes" or "no"?
>
> A  I'm sleeping.  I don't know.
>
> Q  What was the answer?
>
> A  I don't know the answer to that question.

(RT 2:401.)  When the court informed defense counsel he could redirect, petitioner again asserted his Fifth Amendment privilege, stating "I think I've answered enough questions.  I don't want to waste any more precious time of these jurors."  (RT 2:405.)  The court advised petitioner he must answer questions or the court would have to strike all of petitioner's testimony.  (RT

---

[13]  The transcript of the tape was admitted into evidence, People's Exhibit 3.  (CT 246-64.)

2:405.)  Petitioner responded, "[t]hat's my own attorney.  He can request not to ask me any questions.  I'm requesting that he doesn't at this time.  The defense rests." (RT 2:405.)  The court took a recess to allow defense counsel to confer with petitioner.  (RT 2:405-06.)  Outside the presence of the jury, the court addressed petitioner:

> THE COURT:  . . .Now, you're a difficult client for any attorney. The best attorney in the world you would be a difficult client for. That's my observation.
>
>      [There] may be areas that Mr. O'Reilly feels he needs to cover, and the reason I've taken this break and given him the opportunity to discuss that with you, since you're so adamant about not wanting to testify more, he may go along with those wishes, but at the same time, I don't want to call that shot.  Whether he feels in his expertise that there's some areas he needs to cover, whether or not that exists or not is up to him, but I'm going to give him that opportunity to consult with you, if he feels, and explain what areas, if any, he may want to go over on redirect.

(RT 2:406.)

     After the recess, defense counsel stated there would be no redirect and the defense rested.  (RT 2:407.)  The prosecution had no rebuttal.  (Id.)

     Later that day, July 12, 1999, during a conference on jury instructions, prior to closing arguments, the following exchange occurred:

> THE COURT:  Let me just make an observation in – I'm somewhat perplexed by the offer of proof when the court was considering prior sexual offense from what was actually offered by way of tape.  I had expected something more substantive than actually the record reflects was given.
>
> MS. YOUNG:  With respect –
>
> THE COURT:  I had been led to believe that you were going to be bringing in the victim who is now 17 who was the victim at age 11 when I received an offer of proof on prior sex offenses I expected that the record will support the ruling that the court gave, so I am somewhat – had the offer been the playing of this tape indicate to you, I would have not granted your request based upon what I heard in the tape.  It does not support that offense was given, so I just want to make that observation for the record.  Your offer of proof included more than what you actually offered the court and the jury.

24

MS. YOUNG:  I understand, your Honor.  With respect to the People's case in chief, my original intent was to have the woman here.  When that didn't occur, I had just the tape, but this was cross-examination when it came up.  And it was only after [petitioner] made some . . . flat-out denials, that there was information that counsel and I were both aware of what I intended to use to impeach him, I would not have played just the tape.

THE COURT:  I understand your impeachment, but did you make a statement in your opening statement that you were going to show that he committed an offense on –

MS. YOUNG:  No, I did not refer to the 1108.

THE COURT:  Certainly did on your cross-examination.  You went into the area based upon the ruling of the court in your cross-examination of him.

MS. YOUNG:  The ruling of the court was with respect to my case in chief.

THE COURT:  Yes.

MS. YOUNG:  And on cross-examination, he opened the door to other areas as well.

THE COURT:  Well, he opened the door because the door was opened to you to inquire in that area based upon an in limine order that the court made.  I just want the record to reflect that I made certain orders in this case based upon an offer of proof that was not provided in the trial regarding the prior sexual conduct.

(RT 2:413-14.)

        This claim is without merit.  As discussed above, the California Court of Appeal considered the evidence and found that it did not violate state evidentiary limitations regarding impeachment evidence.  On federal habeas review, this court defers to the state court's interpretation of state law.  Given that the state court found that the admission of the audio tape was permissible under state law,[14] it cannot be said that defense counsel's failure to object to this

---

[14]  Generally, extrinsic evidence may not be admitted under Fed. R. Evid. 608(b) to impeach.  Id.  However, while extrinsic evidence generally cannot be used to impeach a witness, extrinsic evidence may be introduced to impeach credibility of a witness by contradiction.  See State v. Chamley, 568 N.W.2d 607 (S.D. 1997).  Moreover, at least one court in California has

1    testimony was deficient performance.

2           In addition, when a party at a prior time made statements inconsistent with his

3    present testimony, those prior statements, or party admissions, may be admitted for impeachment

4    purposes and for the truth of the matter stated.  If the party denies making the prior inconsistent

5    statement, the prosecution can introduce extrinsic evidence to show he made the statement.  The

6    prosecution can even admit illegally-gathered tape recordings for impeachment purposes only.

7    Walder v. United States, 347 U.S. 62, 74 S.Ct. 354 (1954)(court allowed use of illegally seized

8    evidence to impeach the defendant's direct examination assertion that he was innocent of any

9    narcotics activities).

10          While extrinsic evidence in the form of documents may not be
             admitted under Rule 608(b) to impeach, nothing in that rule
11          prohibits the use of documents merely to refresh the recollection of
             a witness who is the target of impeachment.  [Footnote omitted.]
12          Similarly, the rule does not preclude cross-examination based on
             extrinsic evidence that would otherwise be inadmissible. [Footnote
13          omitted.]

14   28 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE

15   § 6117 (2007).

16          Here, the evidence was admitted to refresh petitioner's recollection of the 1993

17   events; petitioner wanted to make sure the prosecution was accurately quoting the question posed

18   to him.  Thus, even if defense counsel had objected to the admission of the audio tape, it is not

19   clear the trial court would have sustained the objection because the prosecution used it to refresh

20   petitioner's recollection and for impeachment purposes only.  The trial judge later conceded he

21   would not have granted the motion in limine to adduce facts concerning petitioner's conduct in

22   1993 based solely on the audio tape, but that does not require an inference that the trial court

23   similarly would have disallowed its use for impeachment purposes.  Because the audio tape

24
25   stated that "under Evidence Code section 770, there is no need to lay a foundation for the
     impeaching testimony. . . . (Evid.Code §§ 770 and 1235; People v. Green, 3 Cal.3d 981, 92
     Cal.Rptr. 494, 479 P.2d 998.)"  People v. Aeschlimann, 28 Cal.App.3d 460, 474, 104 Cal.Rptr.
26   689 (Cal.App. 1972).

contained petitioner's own prior statements, it was permissible for the prosecution to use those statements in an attempt to impeach petitioner.  Moreover, if the judge believed the audio tape should not have been admitted for impeachment purposes, he could have ordered a mistrial based on its alleged wrongful admission.  Instead, the judge focused on the prosecution's questioning of petitioner about the 1993 acts, specifically putting aside the use of the evidence for impeachment purposes:  "I understand your impeachment, but did you make a statement in your opening statement that you were going to show that he committed an offense on –."  (RT 2:414.)  Because of this, it is unlikely an objection by defense counsel would have been sustained.

Petitioner's claim is further hampered by the fact that the United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes."  Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), overruled on other grounds by Woodford v. Garceau, 538 U.S. 202 (2003).  In fact, the Supreme Court has expressly left open this question.  See Estelle v. McGuire, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

But even assuming defense counsel was ineffective for failing to object and that the trial court would have stricken the admission of the audio tape as extrinsic evidence, petitioner cannot demonstrate prejudice under Strickland.

Petitioner cannot show that but for the admission of the audio tape, the outcome of this case would have been different.  First, the prosecution was allowed to question petitioner about the 1993 acts even without admission of the extrinsic evidence.  Those questions were

/////

/////

sufficient to impeach petitioner's credibility on their own, without the audio tape.[15]  Petitioner was also impeached by questions unrelated to the 1993 acts.

Second, the victim testified at trial, providing details as to the alleged sexual misconduct perpetrated by petitioner.  Nurse Schmidt, who examined the victim the day after the alleged misconduct, corroborated the victim's testimony that she had been forcibly raped as evidenced by the tenderness in her vaginal area.  (RT 294-96.)

The defense called Officer Gralien, who interviewed the victim at the hospital, testified as to the contents of his report.  Parts of Officer Gralien's testimony appeared to undermine the victim's testimony.  (RT 192; 265-66; 315-16.)  However, during cross-examination, the prosecution pointed out that Officer Gralien had shorthanded his version of the facts as compared to his report, and had failed to inquire at what point penile penetration took place or exactly when the victim told petitioner to stop.  (RT 324-28.)  The prosecution also impeached Officer Gralien as biased, eliciting his testimony concerning their conversation in the hallway after the preliminary hearing:

> Q (Defense Counsel):  Out in the hallway did I tell you that if you really think that it happened that way, that a victim on a rape case is telling you, no, occurred after penetration, maybe you ought to stop and clarify that; do you recall me saying that to you?
>
> A (Officer Gralien):  I don't recall that.  But, okay.  Yeah.
>
> Q  Do you recall giving your response to me about that?  Do you recall what it was?
>
> A  No.
>
> Q  Didn't you tell me, well, maybe if I have a real victim.  Did you say those words?
>
> A  Yeah, I might have.

---

[15]  Of course, defense counsel could have objected to the prosecution's initial questioning of petitioner based on a lack of foundation for said cross-examination, but that is not petitioner's claim here.  Petitioner has not raised such a claim in state court, so this court may not reach that unexhausted claim.

1      Q  Well, did you say them or not, do you recall?

2      A  Well, I recall several parts of that conversation, yes.

3      Q  How about that part?

4      A  Yeah, I remember saying that.

5      Q  Okay.  at that point did I tell you that maybe for purposes of law
       enforcement and being a police officer that you ought to consider
6      every victim you meet a real victim, did I tell you that?

7      A  I don't recall you saying that.

8      Q  You're aware that because of your performance at the
       preliminary hearing and this report that this is no longer a forcible
9      rape, but only statutory rape?

10     . . .

11     A  Yes.

12 (RT 329-30.)

13         Further, any error in admitting the audio tape evidence did not have "a substantial

14 and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507

15 U.S. 619, 637 (1993).  <u>See also</u> <u>Gordon v. Duran</u>, 895 F.2d 610, 613 (9th Cir. 1990)(admission

16 of prior acts of misconduct to prove intent did not violate due process).  Here, the jury was

17 instructed  as to how to properly view the propensity evidence.  (RT 427.)  The instructions

18 accurately stated the propensity evidence could not be used to prove petitioner committed the

19 instant crimes.  (<u>Id.</u>)  Moreover, the jury reached its verdict quickly.  The jury began deliberating

20 on July 12, 1999 at 4:45 p.m. (CT 197) and reached their verdict on July 13, 1999 at 9:45 a.m.

21 (CT 212.)  No questions or requests for testimony readback were made.  (CT 197, 212.)

22         Based on the foregoing, petitioner's ineffective assistance of counsel claim should

23 be denied.

24         c.  Effect on 98F10893

25         Petitioner also alleges that defense counsel's ineffective assistance of counsel in

26 99F03098 spilled over into the trailing case, 98F10893.  However, as respondent points out,

1  petitioner was represented by Dennis O'Reilly in the instant trial but attorney Betty Bridgers

2  represented petitioner during the plea bargaining in 98F10893.  Petitioner's ineffective assistance

3  of counsel claims here address the performance of counsel in 99F03098.  Thus, this claim must

4  also fail.

5     The state court's rejection of petitioner's second claim for relief was neither

6  contrary to, nor an unreasonable application of, controlling principles of United States Supreme

7  Court precedent.  Petitioner's second claim for relief should be denied.

8     3.  Rules Violation for Failing to Submit DNA Sample

9     Petitioner's third claim is that he sustained two prison disciplinaries for failing to

10  voluntarily submit to DNA testing and the subsequent forcible extraction of DNA violated his

11  right against double jeopardy, First Amendment religious freedom and Eighth Amendment cruel

12  and unusual punishment.  Petitioner contends that he was not informed of the requirement to

13  submit to a DNA test pursuant to Cal. Penal Code Section 296, which was one of the

14  consequences of his no contest plea in Case No. 98F10893.

15     Petitioner presented this claim in two petitions for writ of habeas corpus filed in

16  the Sacramento County Superior Court.  On September 21, 2001, the Sacramento County

17  Superior Court rejected this claim as premature because petitioner's appeals were pending at that

18  time.  (In re David Daniel Cepeda, No. 01F05837 (September 21, 2001), appended as Resp.'s

19  Lodged Document No. 16.)  The court went on to deny petitioner's ineffective assistance of

20  counsel claim related to the DNA claim.

21     Petitioner claims that had counsel told him that he would be
   subject to Penal Code section 296 requiring that a blood sample be

22     taken upon conviction, he would not have changed his plea to no
   contest.  First, Petitioner has not shown that counsel's

23     representation fell below an objective standard.  Petitioner has
   failed to cite any authority indicating that an attorney must advise

24     his client of all collateral consequences or that Penal Code section
   296 is a direct consequence of a conviction such that

25     admonishment is required.  In addition, Petitioner has failed to
   show prejudice.  He claims that he would not have changed his

26     plea if he had known of the requirement for a blood sample.  He

1
2
3
4
5

> states that his Native American heritage does not allow him to give
> blood. However, the abstract of judgment shows that an HIV test
> was conducted in 1999. Furthermore, in the underlying case file is
> a lettre from Petitioner describing blood tests taken for diagnosis of
> Petitioner's medical condition, indicating that the tests were
> conducted voluntarily. Therefore, Petitioner's claim that he would
> have rejected the trial court's offer because of the blood sampling
> is not credible.

6  (Id. at 2.)

7      The Sacramento County Superior Court rejected petitioner's claim, finding

8  petitioner had failed to exhaust his administrative remedies. (In re David Daniel Cepeda, No.

9  04F02015 (April 6, 2004), appended as Resp.'s Lodged Document No. 7, lodged September 21,

10 2005.) Petitioner was assessed 60 days credit forfeitures on two occasions. (Id.) The state court

11 noted that petitioner's

12
13
14
15
16

> original administrative appeal was rejected for being untimely.
> The credit forfeitures took place in 2001 and Petitioner did not file
> any appeal until 2003, well beyond the 15-day time limit.
> Petitioner claims that he was denied access to the law library and
> therefore was denied access to the courts. While this might explain
> or excuse a delay in filing this petition, it does not explain or
> excuse the failure to file an administrative appeal within 15 days of
> the credit loss. Petitioner's failure to exhaust was not excused and
> the petition is therefore barred.

17 (Id.)

18     Petitioner is also required to exhaust his administrative remedies prior to filing a

19 complaint in this court. 42 U.S.C. § 1997e(a). Exhaustion must precede the filing of the

20 complaint and that compliance with the statute is not achieved by satisfying the exhaustion

21 requirement during the course of an action. McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir.

22 2002); see also Porter v. Nussle, 534 U.S. 516, 524 (2002). Petitioner may not pursue his claims

23 in federal court unless and until he has completed the grievance process through the third level of

24 review. See Woodford v. Ngo, ____ U.S. ____, 126 S.Ct. 2378, 2387 (2006). Because

25 petitioner failed to complete the administrative grievance process with regard to his DNA claim,

26 this claim must be dismissed.

1    But even if this court could reach the merits of petitioner's claim, the claim would

2 fail.

3    In Wolff [v. McDonnell, 418 U.S. 539 (1974)], the Supreme
    Court determined that inmates were entitled to procedural due
4    process protections in disciplinary hearings that could result in the
    forfeiture of an inmate's good-time credits. After holding that such
5    a result implicated a protected liberty interest, the Court turned to
    the question of what process the inmate was due. At the outset, the
6    Court held that two elements were essential "if the minimum
    requirements of procedural due process are to be satisfied. These
7    are advance written notice of the claimed violation and a written
    statement of the factfinders as to the evidence relied upon and the
8    reasons for the disciplinary action taken." Wolff, 418 U.S. at 563,
    94 S.Ct. at 2978.

9

10 Neal v. Shimoda, 131 F.3d 818, 830 (9th Cir. 1997). In relevant part for this claim, due process

11 requires that there be "some evidence in the record" to support the disciplinary conviction.

12 Superintendent v. Hill, 472 U.S. 445, 457 (1985).

13    Petitioner does not dispute that the court ordered petitioner to comply with

14 California Penal Code Section 296 during sentencing, but contends he was sobbing so loudly he

15 did not hear it. Petitioner does not dispute the fact that he refused on two occasions the request

16 to have his DNA voluntarily taken from him. Both of these facts are sufficient to meet the "some

17 evidence" standard required to satisfy due process.

18    In addition, the record reflects that the probation officer recommended to the court

19 that petitioner be required to submit to DNA testing. (CT 150.) On October 1, 1999, the court

20 adjourned to allow petitioner's attorneys an opportunity to discuss the probation report with him.

21 (RT 2:527.) The trial court confirmed it would impose the requirements of Cal. Penal Code

22 Section 296 on petitioner. (RT 2:567.)

23    To the extent that petitioner contends California Penal Code Section 296 violates

24 the Constitution, petitioner is mistaken. Turner v. Carpenter, 63 Fed.Appx. 318 (9th Cir. 2003),

25 citing see Rise v. Oregon, 59 F.3d 1556, 1562-63 (9th Cir. 1995)(Oregon statute requiring certain

26 prisoners to provide blood samples to DNA data bank does not require notice and hearing

because only criterion for extracting blood is conviction of predicate offense; thus "there would be little of substance to contest at any provided hearing").  California's Penal Code § 296 does not violate the due process clause or the ex post facto clause of the United States Constitution.

The state court's rejection of petitioner's third claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.  Petitioner's third claim for relief should be denied.

4.  Revocation of Parole

Petitioner's fourth claim is that he was denied due process during the 2004 parole revocation process and his August 24, 2004 parole revocation hearing.  Respondent contends petitioner was released on parole on May 18, 2005 (resp.'s attachment B), rendering this claim moot.

The question presented is whether petitioner's challenge to his 2004 parole revocation proceedings and subsequent hearing are mooted by his subsequent release on parole because the habeas application before this court no longer presents a case or controversy under Article III, § 2, of the United States Constitution.  "This case-or-controversy requirement subsists through all stages of federal judicial proceedings. . . .  The parties must continue to have a personal stake in the outcome of the lawsuit."  Spencer v. Kemna, 523 U.S. 1, 7 (1998).  "This means that, throughout the litigation, the [petitioner] must have suffered, or be threatened with an actual injury traceable to the [respondent] and likely to be redressed by a favorable judicial decision."  Id.

Because petitioner was released on parole on May 18, 2005, a favorable judicial decision on this claim would provide him with nothing.  Petitioner's fourth claim should be denied as moot.[16]

---

[16]  However, the record reflects that during the change of plea hearing on August 19, 1999, the record reflects petitioner stated he understood that if he were sentenced to state prison he would be subject to parole supervision for up to four years upon his release.  (RT 2:502.)

1          5. <u>Change of Plea Hearing</u>

2          Petitioner contends the trial judge accepting petitioner's plea in 98F10893 made

3 coercive statements that improperly induced petitioner to change his plea inadvertently. (Second

4 Am. Pet. at 6.)

5          Petitioner first raised this claim in the February 22, 2005 petition for writ of

6 habeas corpus filed in the California Supreme Court. (Resp.'s Lodged Document No. 8a.) The

7 Supreme Court denied the petition citing <u>In Robbins</u> (1998) 18 Cal.4th 770, 780; <u>In re Swain</u>

8 (1949) 34 Cal.2d 300, 304; <u>People v. Duvall</u> (1995) 9 Cal.4th 464, 474; <u>In re Dexter</u> (1979) 25

9 Cal.3d 921; <u>In re Waltreus</u> (1965) 62 Cal.2d 218. (Resp.'s Lodged Document No. 8b.)

10          When it is clear that a state court has not reached the merits of a petitioner's

11 claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not

12 apply and a federal habeas court must review the claim de novo. <u>Nulph v. Cook</u>, 333 F.3d 1052,

13 1056 (9th Cir. 2003); <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

14          Petitioner's fifth claim was rejected on procedural grounds in state court, so there

15 is no reasoned opinion supporting rejection of the claim considered below. Accordingly, this

16 court reviews the claim de novo.

17          Due process requires that a guilty or nolo contendere[17] plea be both knowing and

18 voluntary because it constitutes the waiver of three constitutional rights: the right to a jury trial,

19 the right to confront one's accusers, and the privilege against self-incrimination. <u>See Boykin v.</u>

20 <u>Alabama</u>, 395 U.S. 238, 242-43 (1969). A trial court must ensure that a criminal defendant is

21 competent to enter a guilty plea. <u>See Godinez v. Moran</u>, 509 U.S. 389, 396 (1993). A habeas

22 petitioner bears the burden of establishing that his guilty plea was not knowing and voluntary.

23 <u>Parke v. Raley</u>, 506 U.S. 20, 31-34 (1992).

24 _____

25          [17]  California Penal Code section 1016 states that "a plea of nolo contendere shall be considered the same as a plea of guilty and [ ] upon a plea of nolo contendere, the court shall find the defendant guilty. The legal effect of such a plea, to a crime punishable as a felony, shall be

26 the same as that of a plea of guilty for all purposes." <u>Id.</u>

"The long-standing test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985). This requires a review of the circumstances surrounding the plea. See Brady v. United States, 397 U.S. 742, 749 (1970). Of particular importance is that defendant enter a guilty plea with "sufficient awareness of the relevant circumstances and likely consequences." Id. at 748.

In Blackledge v. Allison, 431 U.S. 63 (1977), the Supreme Court addressed the presumption of verity to be given the plea proceeding record when the plea is subsequently challenged in a collateral proceeding. While noting that the defendant's representations at the time of his guilty plea are not "invariably insurmountable" when challenging the voluntariness of his plea, the Court stated that, nonetheless, the defendant's representations, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier." "Solemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. at 74.

On July 13, 1999, in Case No. 99F03098,[18] the jury returned guilty verdicts for unlawful sexual intercourse with a minor, who is more than three years younger than petitioner, and contributing to the delinquency of a minor. (RT 2:469.) Petitioner waived time to facilitate the preparation of a probation report. (RT 2:475.) On August 19, 1999, a hearing was held to determine whether petitioner would accept the court's offer of six years in state prison in Case No. 98F10893.[19] (RT 2:476.) The judge stated:

> I'm placing the matter on the record because I've been made to understand through Ms. Bridgers this morning that [petitioner] seems likely to enter a plea, but that she wanted to make sure that he understands all of his rights. And he may have questions about what's going to happen in the future, and I'd like, before I take his plea, to allow him an opportunity to do that.

[18] Dennis O'Reilly represented petitioner in Case No. 99F03098.

[19] Betty Bridgers represented petitioner in Case No. 98F10893.

1   (RT 2:477.)  The prosecution interrupted:

2           I know you said that this was the Court's offer.  That's correct,
            because my offer is eight years, and the midterm lid of the six years
3           would include this case.

4            And I know we've talked in chambers, but so that it's clear, it
            would also include the case where [petitioner] was recently
5           convicted of a statutory rape, which is case number 99F03098.
            The Court indicated that it would run that time concurrent.

6

7   (RT 2:477.)  The judge confirmed that Mr. O'Reilly had discussed the plea offer with Ms.

8   Bridgers.  (RT 2:478.)  The judge explained to petitioner that the six year term would run

9   concurrent with time assessed in 99F03098, and that if the judge exceeded that six year term,

10  petitioner would be allowed to take back his plea and start all over again.  (RT 2:478.)  Petitioner

11  responded, "I understand."  (RT 2:478.)

12          The judge noted that once petitioner was turned over to the California Department

13  of Corrections, the judge had little control over the case.  (RT 2:479.)  The judge discussed the

14  alternatives available to the judge, from granting probation to sending petitioner to state prison.

15  (RT 2:479-81.)  The judge candidly informed petitioner that a prison term was likely because

16  petitioner hadn't "learned the boundaries of staying away from either adolescent or preadolescent

17  children."  (RT 2:481.)  The judge told petitioner he would likely serve 85% of the sentence, less

18  the 275 days petitioner had already served in jail.  (RT 2:481.)

19          The judge reminded petitioner that he did not yet have benefit of a probation

20  report or psychological report and explained in detail that either of those reports could influence

21  the sentencing decision.  (RT 2:480; 483-85.)

22          THE COURT:  I know you're stressed because of the charges you
            face.  That's perfectly natural for you to feel stressed and upset,
23          and I'm sorry about that.  These are one of those nasty decisions
            you have to make in life.  I liken it to a root canal.  If you don't get
24          the tooth out or get it fixed, it gets worse.

25          [PETITIONER]:  It gets worse.

26  /////

THE COURT:  And it's always good to minimize your pain, if you can, and maximize your opportunities.  What I found over and over again in this court, that cases are best resolved at this stage right here, and if it isn't resolved at this stage, it doesn't get better.  It gets worse.

And that's only because judges are human beings, as I told you, like everyone else, and at the end of the trial when I've heard a lot of details, especially from an 8 or 9-year-old victim, alleged victim, and other things, my view of this case changes.

And, uh, at this stage, uh, the fact that you're willing to enter a plea and express some remorse for what happened and pay your dues, whatever those dues are, impresses me favorably?

You see what I mean?

[PETITIONER]:  (Nods.)

THE COURT:  And so I just completed a case.  It was a stalking case, very unlike this case, but the defendant was offered a misdemeanor, very small jail time, 90 days, and he sat in that chair through an entire trial for several weeks and was found guilty on all five counts, including four strikes.

[PETITIONER]:  Oh, my god.  So he's –

THE COURT:  I put him in custody.  He was out of custody, but he picked up four strikes, and he picked up a stalking felony charge by going to trial.  I'm not trying to scare you here.  I'm just saying I have a very different view of that case than I did in the beginning.

This is not . . . a misdemeanor.  It's a felony, and he's going to go to prison because of what I heard in court, stalking her, harassing her, threatening her.

I had an open mind on that case, too, but my view of that case has changed since I had a conversation with that defendant, sitting in this same chair.  So I'm just telling you, if you want to resolve the case, this is the best time to do it.

[PETITIONER]:  I appreciate it.

THE COURT:  If the matter were to go to trial and pick a jury and calling witnesses and suddenly you say, Judge, hold it, I'd like to go back and take the six years that you offered, it will be off the table because, at that point, the Court's invested a lot of time and resources in the courtroom, not to mention the district attorney subpoenaed many witnesses in preparation for this, getting ready for the trial.

1    Quite unlikely I would allow you to accept the offer, but it's more the exception than the rule that I allow the plea to be entered in the

2    case.

3    [PETITIONER]:  You want it now.

4    THE COURT:  Early if we can.

5    [PETITIONER]:  Financial burden and, also, everybody else is inconvenienced.

6

7    THE COURT:  Not to mention Mr. Huggins has to present this case, and he's got witnesses lined up to testify, including an 8-year-old girl, and I'm sure she's under some apprehension.  8 and 9-

8    year-olds don't like coming into a courtroom with adults.  They feel very uncomfortable.  They have to talk about personal things,

9    their privates, and other things.

10    [PETITIONER]:  That's one of the things expressed, and I understand it would be might be [sic] traumatic and detrimental to

11    her health.

12    THE COURT:  Even if you were to win the case and found not guilty, there would be scorched earth in Jojo coming into court and

13    testifying.  [¶]  Do you understand what I'm saying?

14    [PETITIONER]: Yes.

15    THE COURT:  And I'm not trying to shame you, make you feel you have to do this in Jojo's interest, but it does impress me you'd

16    like to prevent her from taking the stand, and that's why I'm offering the midterm rather than the term offered by the district

17    attorney.  I've been doing a lot of talking.  [¶]  Are there things you'd like to ask me before I get into the specifics?

18    [PETITIONER]:  Yes. . . .

19

20  (RT 2:485-87.)  Petitioner went on to explain his family difficulties and asked the court for some

21  rehabilitation.  (RT 2:487-90.)

22    [PETITIONER]:  And I also want to save Jojo, like I said before, from taking the stand, that traumatic situation.  If I do take a plea

23    bargain, like I said, these people are going to continue on their way.  I'm going to go ahead and pay what I owe, my debt to

24    society, but I also have concern for these children.  Maybe they are in a bad situation.

25

26  (RT 2:490.)  The judge inquired whether alcohol played a role in this and petitioner conceded it

did.  (RT 2:491.)  After addressing other questions by petitioner, not relevant here, the court

proceeded to place the formal change of plea offer on the record.  (RT 2:498.)  The prosecution

confirmed the court's offer was for two years less than the eight years the prosecution had

offered.  (RT 2:499.)

>   THE COURT:  . . . [Petitioner], do you understand what I've said
>   this morning about the plea and your exposure, that is, the worst
>   thing that can happen to you and the better things that can happen
>   to you?  Do you understand all those things?
>
>   [PETITIONER]:  Yes, your Honor.
>
>   THE COURT:  And is this what you're prepared to do this morning?
>
>   [PETITIONER]:  Yes, your Honor.
>
>   THE COURT:  Ms. Bridgers, have you discussed all the elements
>   of 288(a), that is, what the People have to prove under 288(a) case?
>
>   [PETITIONER]:  Yes.
>
>   MS. BRIDGERS:  Yes, your Honor.
>
>   THE COURT:  And his possible defenses to the charges?
>
>   MS. BRIDGERS:  Yes.
>
>   THE COURT:  Have you discussed his rights with him?
>
>   MS. BRIDGERS:  Yes.
>
>   THE COURT:  Have you discussed the consequences of a plea of no contest?
>
>   MS. BRIDGERS:  Yes.
>
>   THE COURT:  Will the plea be no contest?
>
>   MS. BRIDGERS:  Yes, it will.
>
>   THE COURT:  Very good.  Are you satisfied your client
>   understands those things?
>
>   MS. BRIDGERS:  Yes.
>
>   THE COURT:  Do you understand those things, [petitioner]?
>   Have you had adequate opportunity to discuss with them Ms.
>   Bridgers, your counsel?

1    [PETITIONER]:  Yes, your Honor.

2    THE COURT:  If you enter a plea of no contest to the charges,
     [petitioner], it will have the same force and effect with me as a plea
3    of guilty, and I will find you guilty.  [¶]  Do you understand that?

4    [PETITIONER]:  Yes.

5  (RT 2:499-500.)  The prosecution then stated the factual basis for the plea.  (RT 2:500-01.)

6           Petitioner confirmed he understood that he would have to pay a restitution fine,

7  that for a violation of 288(a), the low term was six years, the high term was eight years, and that

8  if the court placed petitioner on probation the court could stay or suspend one of those terms as

9  well as impose special conditions on probation.  (RT 2:500-01; 502.)  Petitioner confirmed he

10  understood that if he was sentenced to state prison he would be subject to parole supervision for

11  up to four years upon release.  (RT 2:502.)  Petitioner stated he understood that he would be

12  required to register with law enforcement as a convicted sex offender.  (RT 2:503.)  Petitioner

13  confirmed that if the sentencing judge decided to disapprove the plea and impose a sentence for

14  eight years, petitioner could take back his plea and have a jury trial.  (RT 2:503.)

15          Petitioner stated he understood and gave up his rights to a speedy and public jury

16  trial, the right to remain silent, to present his defense, and to confront witnesses against him.  (RT

17  2:504.)  Petitioner denied that anyone had made him any promises or secret deals to get him to

18  enter his plea.  (RT 2:504-05.)  Petitioner denied he had been threatened in any way.  (RT 2:505.)

19   THE COURT:  You hesitated.  Has anybody threatened you to get
     you to plead guilty, other than the fact of a longer time in state
20   prison?

21   [PETITIONER]:  That's about it, but, also, I'm doing it for the
     other reasons, best interests of the children.
22

23  (RT 2:505.)  Petitioner entered his plea of no contest.  (RT 2:506.)  Petitioner confirmed he had

24  entered his plea freely and voluntarily.  (RT 2:506.)

25          Here, petitioner contends that his plea was wrongfully induced by the judge who

26  made coercive statements to improperly induce petitioner to change his plea.  Petitioner contends

1  the judge should not have initiated the plea because the prosecution had insufficient evidence and

2  argues the judge's overinvolvement in the plea bargain process violated due process.  Petitioner

3  argues that the judge scared and coerced petitioner into accepting the plea offer.

4         A guilty plea induced by promises or threats that deprive it of the character of a

5  voluntary act is void.  See Machibroda v. United States, 368 U.S. 487, 493 (1962).  Agents of the

6  state may not produce a plea by mental coercion overbearing the will of the defendant.  See

7  Brady, 397 U.S. at 750.  Nor is coercion by a defendant's attorney or other third party acceptable.

8  See Iaea v. Sunn, 800 F.2d 861, 866-68 (9th Cir.1986).

9         A plea is "involuntary" if it is the product of threats, improper promises, or other

10 forms of wrongful coercion.  Brady, 397 U.S. at 750.  A plea is "unintelligent" if the defendant is

11 without the information necessary to assess intelligently "the advantages and disadvantages of a

12 trial as compared with those attending a plea of guilty. . . ."  United States v. Hernandez, 203

13 F.3d 614, 619 (9th Cir.2000).

14        The plea hearing transcript, 28 pages long, reflects that the judge took great care

15 to ensure that petitioner was aware of the situation he was facing and understood all of his rights

16 with regard to the possible change of plea.  The judge gave petitioner multiple opportunities to

17 ask questions.  While the prosecution had offered petitioner an eight year maximum offer, the

18 trial judge was reducing the maximum to six years and offering to run the sentences concurrently

19 so that petitioner would serve no more than six years.  The judge's acts did not violate

20 petitioner's due process rights and were within the judge's discretion.  The record does not

21 reflect that petitioner was forced or coerced into changing his plea but that petitioner entered the

22 change of plea freely and voluntarily.  Petitioner's fifth claim for relief should be denied.

23        In accordance with the above, IT IS HEREBY RECOMMENDED that

24 petitioner's application for a writ of habeas corpus be denied.

25        These findings and recommendations are submitted to the United States District

26 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

1  days after being served with these findings and recommendations, any party may file written

2  objections with the court and serve a copy on all parties.  Such a document should be captioned

3  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

4  failure to file objections within the specified time may waive the right to appeal the District

5  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

6  DATED:  January 9, 2008.

7

8                                          UNITED STATES MAGISTRATE JUDGE

9

10  001; cepe1899.157

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26